IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SOUTHERN AFRICA ENTERPRISE DEVELOPMENT FUND,<br><br>        Plaintiff,<br><br>    v.<br><br>IRONSHORE SPECIALTY INSURANCE COMPANY,<br><br>        Defendant. | C.A. No. _____ |

## COMPLAINT OF SOUTHERN AFRICA ENTERPRISE DEVELOPMENT FUND

The Southern Africa Enterprise Development Fund ("SAEDF") files this complaint for declaratory judgment, breach of contract, and breach of the duty of good faith and fair dealing against Ironshore Specialty Insurance Company ("Ironshore") alleging as follows:

## NATURE OF THE ACTION

1. Pursuant to an administrative audit, the United States Agency for International Development ("USAID") determined that SAEDF is legally obligated to pay $2,337,402 because of alleged violations of SAEDF's fiduciary duties (the "USAID Claim").

2. Ironshore issued a "Not-for-Profit Entity and Directors, Officers Liability Insurance Policy Including Employment Practices Claims Coverage With Costs of Defense Included in the Limit of Liability" insurance policy to SAEDF (the "Policy", attached hereto as Exhibit A).

3. SAEDF provided timely notice of the USAID Claim and demanded Ironshore pay the Loss for this covered Claim. Ironshore improperly denied coverage for the Claim and failed and refused to pay the covered Loss arising from the USAID Claim, in breach of its obligations under the Policy.

4. This dispute arises out of Ironshore's failure and refusal to pay the covered Loss

for the USAID Claim and otherwise to perform its obligations under the Policy.

5. SAEDF seeks declarations concerning Ironshore's obligations under the Policy for the covered Losses incurred as a result of the USAID Claim.

6. SAEDF asserts a breach of contract claim against Ironshore under the Policy for its anticipatory repudiation of the Policy and/or failure and refusal to pay the covered Loss incurred by SAEDF for the USAID Claim.

7. SAEDF asserts a claim for breach of the covenant of good faith and fair dealing under the Policy for Ironshore's unreasonable failure and refusal to honor its contractual obligations to SAEDF under the Policy, including by failing to timely or reasonably acknowledge and/or respond to SAEDF's demand for coverage and repeated communications and good faith attempts to resolve the USAID Claim.

## THE PARTIES

8. Plaintiff Southern Africa Enterprise Development Fund is a not for profit corporation organized under the laws of Delaware.

9. Defendant Ironshore Specialty Insurance Company is a corporation organized under the laws of Arizona with its principal place of business in Massachusetts. Upon information and belief, at all relevant times, Ironshore was licensed to do business and conducted business in Delaware.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between SAEDF and Ironshore and the amount in controversy exceeds $75,000.

11. Ironshore has consented to this Court's jurisdiction in the Policy, which provides,

in relevant part, that "[i]n the event of the failure of the Insurer to pay any amount claimed to be due hereunder, the Insurer at the request of the Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States."  Ex. A at p. 16.

12. This Court has the power to declare the parties' rights and obligations pursuant to 28 U.S.C. § 2201.

13. Venue in this district is proper under 28 U.S.C. § 1391(b)(3) because Ironshore is subject to the court's personal jurisdiction with respect to such action.

## FACTUAL ALLEGATIONS

### I. SAEDF's Mission

14. SAEDF was established in 1993 as a joint initiative of former President Bill Clinton, the U.S. Congress, and former South African President Nelson Mandela, for the purpose of providing funding to stimulate the growth of small local businesses in Southern Africa.

15. USAID awarded grant AOT-G-00-95-00086-001 to SAEDF to support SAEDF's mission to promote private enterprise in Southern Africa (the "Grant").

16. According to the Grant's program description, the purpose of SAEDF is to "encourage the creation and expansion of indigenous emerging enterprises, including small and medium-sized firms, in the southern Africa region…"  This purpose would be "accomplished through transactions which will assist in the initiation and expansion of a wide array of private enterprises, promote and disseminate modern business know-how and practices and demonstrate to other potential investors that private sector investment can be undertaken profitably in southern Africa. The Fund will seek to develop an investment portfolio which over the long term will make the Fund self-sustaining."  In fact, as of September 30, 2009, SAEDF was self-sustaining and began operating entirely on "Program Income."

17. Under Modification 04 of the Grant, "Program Income" was excluded from the requirements of OMB Circular A-122, which outlines the types of costs that non-profit organizations are allowed to incur. Instead, the Modification stated that "program income would be subject to SAEDF's corporate and accounting policies and procedures".

18. SAEDF managed its investments internally until 2009, when, in an effort to privatize SAEDF and eventually wind down the fund, USAID approved SAEDF's efforts to establish a new private equity fund. This included approval from USAID of the formation of an outside entity to provide SAEDF with investment management services.

19. Consistent with this approval, SAEDF and Inflection Capital Partners, LLC ("ICP") entered into an Investment Management Services Agreement ("IMA") that was reviewed and approved by USAID.

20. SAEDF terminated the IMA in November 2011 because ICP did not raise a private fund by the deadline imposed by USAID. ICP then initiated arbitration proceedings against SAEDF seeking termination fees.

21. During the arbitration proceedings, SAEDF learned that ICP deviated from the budget that it had submitted to SAEDF and USAID and that certain compensation ICP paid to its principals could be "Excess Benefits" as defined in the Internal Revenue Code (IRC).

22. The arbitrator declined to address the IRS issue of whether or not an excess benefit had been paid, but ruled that (1) the plain language of the IMA did not specifically prohibit the compensation to the ICP principals, and (2) SAEDF did not owe ICP any termination fees.

23. SAEDF subsequently reported the "Excess Benefits" claim to the Internal Revenue Service (IRS) and USAID, which triggered an audit of SAEDF by the Office of Inspector General ("OIG").

## II. The USAID Claim

24. On December 4, 2013, the OIG sent SAEDF its Audit Report No. 3-000-14-001-E, which covered the period from October 1, 2010 through September 30, 2012. The OIG questioned amounts SAEDF had paid totaling $2,769,459.

25. SAEDF challenged the audit findings, and in a decision dated May 19, 2014, USAID determined that SAEDF was liable for $2,697,402 for the following amounts identified in the audit: (a) $1,109,459 of excess compensation paid to ICP principals; (b) $1,300,000 of a $2,500,000 management fee that SAEDF paid to ICP; and (c) $360,000 in lobbying fees.

26. On June 18, 2014, SAEDF filed a timely appeal of this decision to the Deputy Assistant Administrator, Bureau of Management of USAID.

27. On December 8, 2017, the Bureau for Management of USAID issued a final decision on SAEDF's appeal, holding SAEDF liable for damages of $2,337,402 because of the excess management fees and the compensation it had paid to ICP. USAID conceded that SAEDF, as a nonprofit, did nothing wrong in spending a relatively small amount of non-grant money on lobbying fees.  Exhibit B at 7.

28. In its decision, USAID identified the spent funds as Program Income, i.e. SAEDF's money.  Nonetheless, USAID decided that the "use of program income… had to comply with SAEDF's corporate and accounting policies [which] still required SAEDF to exercise a certain level of fiduciary oversight over the funds and maintain certain internal controls." Ex. B at 4.

29. Accordingly, USAID concluded that SAEDF had breached its fiduciary duties and duty of care: "SAEDF violated both its general fiduciary requirements and its internal controls policies by not providing discernible oversight of ICP. As a result, SAEDF paid ICP $2,500,000 without ICP completing any substantive work towards privatization… There is no indication that

SAEDF provided even a basic level of oversight of the funds… SAEDF's actions violated its internal control requirements for making payments and its general fiduciary responsibilities, which required SAEDF to exercise effective control and accountability of all funds", Ex. B at 6, and demanded payment of $2,337,402.

**III.     Ironshore's Failure to Provide Coverage**

30.     Ironshore issued a "Not-for-Profit Entity and Directors, Officers Liability Insurance Policy Including Employment Practices Claims Coverage With Costs of Defense Included in the Limit of Liability" insurance policy, with policy number 000600404, for the period September 13, 2013 to September 13, 2014. *See* Ex. A.

31.     Coverage under the Policy is subject to a $1.5 million limit of liability and $150,000 retention.  Ex. A at 22.

32.     The Policy provides that "[t]he Insurer shall pay on behalf of the Not-For-Profit Entity all Loss which the Not-For-Profit Entity shall be legally obligated to pay as a result of a Claim (including an Employment Practices Claim) first made against the Not-For-Profit Entity during the Policy Period or the Discovery Period for a Wrongful Act, and reported to the Insurer pursuant to Section VII."  Ex. A at 4.

33.     "Claim" is defined in the Policy to mean, among other things, "a civil, criminal, governmental, regulatory, administrative, or arbitration proceeding made against any Insured seeking monetary or non-monetary relief and commenced by the service of a complaint or similar pleading, the return of an indictment, or the receipt or filing of notice of charges or similar document… or other written demand for monetary or non-monetary relief made against any Insured." Ex. A at 5.

34.     "Loss," is defined in the Policy to mean among other things "compensatory

damages… punitive or exemplary damages, the multiple portion of any multiplied damage award, judgments, settlements, pre- and post-judgment interest, and Costs of Defense..." Ex. A at 6.

35. "Wrongful Act" is defined in the Policy to mean, among other things, "any actual or alleged act, omission, error, misstatement, misleading statement, neglect or breach of duty… by the Not-For-Profit Entity."

36. The USAID Claim triggers coverage under the Policy because it is a "written demand for monetary relief" that was "first made" against SAEDF during the Policy Period for a Wrongful Act.

37. On or about June 17, 2014, SAEDF submitted notice of USAID's initial decision on the audit report to Ironshore.

38. On June 19, 2014, Ironshore acknowledged receipt of SAEDF's notice.

39. On July 2, 2014, Ironshore requested additional information and documents in connection with its coverage investigation.

40. On August 8, 2014, SAEDF responded with additional information and documents requested in the July 2, 2014 letter, including:

    a. The December 4, 2013 audit report of the OIG

    b. SAEDF Grant No AOT-0514-G-00-5086-00 and Circular No. A-50 Revised, which is referred to in USAID's final decision letter dated May 19, 2014

    c. The management agreement between SAEDF and ICP

    d. correspondence between USAID and SAEDF concerning the subject matter of the May 19, 2014 decision, including the audit notification, as well as correspondence subsequent to the May 19, 2014 letter

41. In a letter dated November 24, 2014, Ironshore acknowledged that the USAID

Claim "constitutes a Claim under Section II.B of the Policy because it is a written demand for monetary relief… that was made against an Insured (SAEDF)… the Demand Letter constitutes a Claim that was apparently first made against the Not-For-Profit Entity during the Policy Period for a Wrongful Act." Ironshore further acknowledged that "it appears that Insuring Agreement I.C. will apply to certain aspects of the submitted matter and Ironshore will therefore provide coverage, including advancement of Costs of Defense, to SAEDF, subject to satisfaction of the $150,000 per Claim Retention and subject to all other terms, conditions and exclusions of the Policy."  Exhibit C at 3-4.

42. In a letter dated December 27, 2017, SAEDF notified Ironshore of USAID's final decision on SAEDF's appeal.  SAEDF also disputed certain aspects of Ironshore's reservation of rights and handling of defense costs.

43. Through April 2018, the parties exchanged position letters regarding defense costs.

44. SAEDF did not receive a substantive response to its April 2018 letter to Ironshore or subsequent attempts to resolve the matter. Left with no other option, SAEDF through counsel, by letter dated October 3, 2018, demanded Ironshore honor its insuring obligations and make its limits available to fund SAEDF's anticipated effort to negotiate a settlement with USAID.

45. In response, on October 22, 2018, Ironshore improperly denied SAEDF's claim. *See* Exhibit D.

46. Ironshore erroneously contended that SAEDF's liability for the USAID Claim was not a Loss under the Policy because it was for uninsurable restitution.  Ironshore also improperly asserted that the USAID Claim was not covered because of the application of the contractual liability exclusion, and the exclusion with respect to an Insured acting in a non-insured capacity with a non-insured entity. Ironshore further contended erroneously that the Policy does not cover

pre-tender defense costs, that the USAID Claim was not first made during the Policy period, SAEDF did not provide timely notice, losses were subject to Exclusion A and the Policy is subject to rescission based on a material misrepresentation in SAEDF's policy application. *See* Exhibit D.

47. SAEDF contested the denial by letter dated June 28, 2019, advising Ironshore that (a) SAEDF's liability for the USAID Claim is covered compensatory damages, not restitution, and that restitution is insurable under applicable Delaware law (b) the Loss does not arise from contractual liability, but from SAEDF's breach of fiduciary duty, and (c) the Loss arises from SAEDF's alleged wrongdoing and not the actions of any other Insured in a non-insured capacity. Finally, SAEDF advised Ironshore that the USAID Claim was indeed first made during the Policy Period and was not a known loss or misrepresented in the application. *See* Exhibit E.

48. Ironshore has never provided a substantive response to this letter. Instead, since June 2019, Ironshore has responded to SAEDF's repeated efforts to pursue coverage with only hollow statements of its purported willingness to discuss the Claim and numerous requests for additional information. Apparently this was all a feint, as Ironshore has repeatedly and continuously ignored SAEDF's efforts (or claimed to have not received them) and delayed the scheduling of numerous meetings about resolution, including the Policy-mandated mediation.

49. On August 13, 2021, the parties engaged in mediation in accordance with the terms of the Policy. The mediation was not successful.

50. Ironshore's denial of the Claim and failure and refusal to pay the Loss and/or meaningfully discuss resolution of this dispute violates both the letter and the spirit of the Policy. There is an actual and present controversy between the SAEDF and Ironshore as to the nature and extent of Ironshore's obligations to SAEDF under the Policy with respect to the USAID Claim.

**COUNT I**
**(Declaratory Judgment)**

51. SAEDF repeats and incorporates by reference the allegations set forth in paragraph 1 through 50, as though fully set forth herein, and further alleges as follows.

52. Ironshore is obligated, under the Policy and applicable law, to pay the Loss incurred by SAEDF as a result of the USAID Claim up to the Policy's limits of liability.

53. Ironshore wrongfully denied the USAID Claim and has failed and refused to fully acknowledge, accept, or undertake without reservation its obligations to pay the USAID Claim up to the Policy's limits of liability.

54. SAEDF seeks a declaration of its rights and Ironshore's obligations under the Policy, that the Policy provides coverage for the USAID Claim, and that SAEDF is entitled to recovery of its Loss up to the Policy's limit of liability.

55. An actual and justiciable controversy exists between SAEDF and Ironshore concerning SAEDF's rights and Ironshore's obligations under the Policy as respects the USAID Claim.

56. A judicial declaration is necessary and appropriate at this time, and under the circumstances alleged above, so that SAEDF may ascertain its rights under the Policy.

## COUNT II
### (Breach of Contract)

57. SAEDF repeats and incorporates by reference the allegations set forth in paragraph 1 through 50, as though fully set forth herein, and further alleges as follows.

58. The Policy is a valid and binding contract between SAEDF and Ironshore.

59. The USAID Claim falls squarely within the coverage provided by the Policy.

60. No exclusions or limitations in the Policy apply to bar or limit coverage.

61. Yet, Ironshore wrongfully denied coverage for the USAID Claim and refused to pay covered Loss incurred by SAEDF as a result of the USAID Claim, thereby unequivocally

repudiating its obligations under the Policy and committing an anticipatory breach of the Policy.

62. Ironshore wrongfully denied coverage for the USAID Claim and failed and refused to fund a settlement with USAID and otherwise failed and refused to pay covered Loss incurred by SAEDF as a result of the USAID Claim, thereby breaching the Policy by failing and refusing to honor its insuring obligations.

63. As a direct and proximate result of Ironshore's breach of contract, SAEDF is entitled to damages in an amount to be determined at trial, including recovery of its Loss up to the Policy's limit of liability, pre- and post-judgment interest and any other costs and relief this Court deems appropriate.

## COUNT III
### (Breach of the Covenant of Good Faith and Fair Dealing)

64. SAEDF repeats and incorporates by reference the allegations set forth in paragraph 1 through 50, as though fully set forth herein, and further alleges as follows.

65. The Policy is a valid and binding contract between SAEDF and Ironshore, and, as such, contains an implied covenant of good faith and fair dealing.

66. Ironshore has failed and refused to honor its contractual obligations to SAEDF and failed and refused to acknowledge, accept or undertake its insuring obligations with respect to the USAID Claim, thus injuring SAEDF's right to receive the benefits under the Policy.

67. Ironshore's denial of SAEDF's claim lacks any reasonable basis.

68. Ironshore knew or was actually or implicitly aware of the lack of any reasonable basis to deny coverage.

69. Ironshore acted with reckless disregard as to the unreasonableness of its denial.

70. Ironshore breached its duty of good faith and fair dealing by unreasonably failing to provide coverage.

71. Ironshore willfully and knowingly breached its duty of good faith and fair dealing by:

   a. Failing to investigate, adjust and resolve the Claim in the shortest reasonable period;

   b. Failing to timely or reasonably investigate, acknowledge or adequately respond to SAEDF's communications and repeated good faith attempts to resolve the Claim;

   c. Failing to provide a reasonable explanation for the delay in investigating, responding and/or resolving the Claim despite SAEDF's repeated good faith requests;

   d. Misrepresenting that it would engage in good faith discussions about resolving the Claim;

   e. Unreasonably and inexcusably delaying responses to SAEDF's good faith requests to resolve the Claim, including delaying the mediation mandated by the Policy, and payment of the Claim;

   f. Misrepresenting pertinent facts or insurance policy provisions relating to coverage for the USAID Claim; and

   g. Compelling SAEDF to institute this litigation to recover amounts due under the Policy.

72. Ironshore has willfully and knowingly breached, and continues to willfully and knowingly breach, the implied covenant of good faith and fair dealing in its handling of the Claim.

73. As a direct and proximate result of Ironshore's purposeful breaches of the implied covenant of good faith and fair dealing, SAEDF has suffered and is continuing to suffer damages, and is entitled to recover direct, indirect and consequential damages in an amount to be determined

at trial, including recovery of its Loss up to the Policy's limit of liability, costs, attorneys' fees, interest and any other costs and relief that this Court deems appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, SAEDF respectfully requests the following relief:

A. For an order pursuant to 28 U.S.C. § 2201, declaring that the USAID Claim is covered under the Policy and that Ironshore is obligated to pay SAEDF's Loss, up to the Policy limits, arising from, or incurred in connection with, the USAID Claim;

B. For an order awarding SAEDF all direct and consequential damages, in an amount to be proven at trial, together with costs and expenses, including but not limited to its attorneys' fees, in bringing and pursuing this action;

C. For an order awarding the SAEDF pre-judgment and post-judgment interest;

D. Such other and further relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

SAEDF hereby demands a trial by jury herein for all issues so triable.

Dated: October 18, 2021

MORGAN, LEWIS & BOCKIUS LLP
Ariane Baczynski
1 Federal Street
Boston, Massachusetts 02110
(617) 341-7700
Ariane.baczynski@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP

*/s/ Jody C. Barillare*
Jody C. Barillare (#5107)
1201 N. Market St., Suite 2201
Wilmington, DE 19801
(302) 573-3000
jody.barillare@morganlewis.com

*Attorneys for Plaintiff Southern Africa Enterprise Development Fund*