# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SOUTHERN AFRICA ENTERPRISE DEVELOPMENT FUND,<br><br>    Plaintiff,<br><br>  v.<br><br>IRONSHORE SPECIALTY INSURANCE COMPANY,<br><br>    Defendant. | Civil Action No. 21-1463-GBW |

## MEMORANDUM ORDER

Plaintiff Southern Africa Enterprise Development Fund ("SAEDF" or "Plaintiff") filed this action against Defendant Ironshore Specialty Insurance Company ("Ironshore" or Defendant") on October 18, 2021. D.I. 1. SAEDF filed the complaint for (1) declaratory judgment, (2) breach of contract, and (3) breach of the duty of good faith and fair dealing against Ironshore. *Id.* Pending before the Court is Ironshore's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). D.I. 8. The Court considered the parties' briefing (D.I. 12, 17, 18[1]) and finds a hearing on the Motion is unnecessary. For the reasons below, the Court DENIES Ironshore's Motion.

---

[1] Ironshore filed corrected versions of its earlier-filed Opening Brief (D.I. 9) and Reply Brief (D.I. 16) on February 15, 2022. *See* D.I. 19.

1

## I. BACKGROUND[2]

SAEDF was established in 1993 to "encourage the creation and expansion of indigenous emerging enterprises, including small and medium-sized firms, in the southern Africa region[.]" D.I. 1 ¶ 16. This would be achieved

> through transactions which will assist in the initiation and expansion of a wide array of private enterprises, promote and disseminate modern business know-how and practices and demonstrate to other potential investors that private sector investment can be undertaken profitably in southern Africa. The Fund will seek to develop an investment portfolio which over the long term will make the Fund self-sustaining.

*Id.* In 2009, SAEDF hired Inflection Capital Partners, LLC ("ICP") to help SAEDF privatize itself and establish a new private equity fund. *Id.* ¶¶ 18-19. In November 2011, the relationship between SAEDF and ICP terminated. *Id.* ¶ 20. During arbitration proceedings related to this termination, SAEDF learned that certain compensations paid by ICP could be "Excess Benefits" as defined in the Internal Revenue Code ("IRC"). *Id.* ¶¶ 21-22. SAEDF reported ICP to the Internal Revenue Service ("IRS") and United States Agency for International Development ("USAID"), which triggered an audit of SAEDF by the Office of Inspector General ("OIG"). *Id.* ¶ 23. USAID determined that SAEDF was liable for $2,337,402, because it "violated both its general fiduciary requirements and its internal controls policies by not providing discernible oversight of ICP" (the "USAID claim"). *Id.* ¶¶ 1, 24-29.

Ironshore issued a "Not-for-Profit Entity and Directors, Officers Liability Insurance Policy Including Employment Practices Claims Coverage With Costs of Defense Included in the Limit of Liability" insurance policy ("the Policy") to SAEDF. *Id.* ¶ 30. SAEDF filed a claim with Ironshore regarding the USAID claim. *Id.* ¶¶ 36-44. On October 22, 2018, Ironshore denied

---

[2] Under Rule 12(b)(6), the Court must accept as true all factual allegations in the Complaint and view those facts in the light most favorable to the plaintiff. *See Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 351 (3d Cir. 2020).

2

SAEDF's claim. *Id.* ¶ 45. This action arises from Ironshore's denial of SAEDF's claim. *See generally id.*

## II.   LEGAL STANDARD

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Such a claim must plausibly suggest "facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). But the Court will "'disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements.'" *Princeton Univ.*, 30 F.4th at 342 (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)).

"'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Pinnavaia v. Celotex Asbestos Settlement Tr.*, 271 F. Supp. 3d 705, 708 (D. Del. 2017) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)), *aff'd*, 2018 WL 11446482 (3d Cir. Apr. 6, 2018). Rule 12(b)(6) requires the court to accept all factual allegations in the complaint as true and view them in the light most favorable to plaintiff. *AbbVie Inc*, 976 F.3d at 351. The court may consider matters of public record and documents attached to, "integral to[,] or explicitly relied upon in" the complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (cleaned up); *see also Spizzirri v. Zyla Life Scis.*, 802 F. App'x 738, 739 (3d Cir. 2020) (same). "A motion to dismiss 'may be granted only

if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief.'" *McCrone v. Acme Markets*, 561 F. App'x 169, 172 (3d Cir. 2014) (quoting *Burlington Coat Factory*, 114 F.3d at 1420).

### III. DISCUSSION

For the reasons discussed below, the Court finds SAEDF has alleged sufficient facts to support its claim that the USAID claim falls within the plain language of the Policy.

The parties dispute whether the Policy is governed by the District of Columbia or Delaware law. *See* D.I. 1 ¶ 47; D.I. 17 at 11 n.7; D.I. 12 at 7 n.4. Here, the Policy does not contain a choice-of-law provision. *See* D.I. 1-1, Ex. A. SAEDF argues that Delaware law should apply. D.I. 1 ¶ 47; D.I. 12 at 7 n.4. Ironshore argues District of Columbia law applies. D.I. 17 at 11 n.7.

The Court finds Delaware law applies. The parties appear to agree that the laws of District of Columbia or Delaware would produce the same result on the issues presented in the Motion. *See* D.I. 12 at 7 n.4 (citing *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017)); D.I. 18 (failing to oppose SAEDF's statement); *see also Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) ("According to conflicts of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question."); *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010).[3]

---

[3] Even if there was a conflict of laws issue between the two jurisdictions, Delaware law would apply. The Policy is titled, "Not-for-Profit Entity and Directors, Officers Liability Insurance Policy Including Employment Practices Claims Coverage With Costs of Defense Included in the Limit of Liability." In other words, the Policy is a D&O policy. SAEDF "is a not for profit corporation organized under the laws of Delaware." D.I. 1 ¶ 8. "[T]he state of incorporation is the center of gravity of the typical D&O policy." *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 901-02 (Del. 2021). "Delaware law governs the duties of the directors and officers of Delaware corporations to the corporations, its stockholders, and its investors. As such, corporations must assess their need for D&O coverage with reference to Delaware law." *Id.*

The parties dispute whether the Policy's definition of "Loss" includes the USAID claim. Ironshore argues that the USAID claim does not fall within the indemnity coverage of the Policy. D.I. 17 at 2, 9-18. SAEDF argues Ironshore improperly "narrow[s]" the definition of "Loss." D.I. 12 at 8. Under Delaware law, "[t]he interpretation of an insurance policy is a question of law" that begins with the plain language of the Policy. *RSUI*, 248 A.3d at 905 (quotation omitted). "If the contract language is 'clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning.'" *Id.* "Where the language is ambiguous, the contract is to 'be construed most strongly against the insurance company that drafted it.'" *Id.* (citation omitted),

> The Policy defines "Loss" to mean:
>
> compensatory damages (including back pay and front pay), punitive or exemplary damages, the multiple portion of any multiplied damage award, judgments, settlements, pre- and post-judgment interest, and **Costs of Defense**.

D.I. 1-1, Ex. A at 6 (emphasis in original). Ironshore argues that SAEDF's claim does not meet any of the required elements of "Loss." D.I. 17 at 11-14. Specifically, Ironshore argues that any amounts claimed by SAEDF from the USAID claim are not for "compensatory damages." D.I. 17 at 13. Ironshore argues that "compensatory damages" means "money awarded to a victim to make up for an injury, damage, etc." (D.I. 17 at 11 (citation omitted)) and, here, "USAID's disallowance of SAEDF's impermissible expenditures" is not "compensation" to USAID nor has USAID suffered from an "injury." D.I. 17 at 13. Ironshore also argues that USAID's final administrative order is not a "judgment." D.I. 17 at 14-18.[4]

---

[4] The Policy does not define "compensatory damages" or "judgment." *See generally* D.I. 1-1, Ex. A.

5

The Court finds, at this stage of the litigation, Ironshore's interpretation of "Loss" is too narrow and fails to interpret the term within the context of the entire Policy. *See RSUI*, 248 A.2d at 905. The Policy states:

> The **Insurer** shall pay on behalf of the **Not-For-Profit Entity** all **Loss** which the **Not-For-Profit Entity** shall be legally obligated to pay as a result of a **Claim** (including an **Employment Practices Claim**) first made against the **Not-For Profit Entity** during the **Policy Period** or the Discovery Period for a **Wrongful Act**, and reported to the **Insurer** pursuant to Section VII.

D.I. 1-1, Ex. A at 4 (emphasis in original). The Policy defines "Claim" to mean, among other things, "a civil, criminal, governmental, regulatory, administrative, or arbitration proceeding made against any Insured seeking monetary or non-monetary relief . . . ." *Id.* at 5. The Policy defines "Wrongful Act" to mean, among other things, "any actual or alleged act, omission, error, misstatement, misleading statement, neglect or breach of duty, or **Employment Practices Wrongful Act**, by the **Not-For-Profit Entity**." *Id.* at 8. The parties do not dispute that there is a "Claim" or that there is a "Wrongful Act." *See generally* D.I. 17, 18; *see also* D.I. 12 at 8.

The Policy states that Ironshore must pay all "Loss" that SAEDF is "legally obligated to pay as a result of a **Claim** . . . for a **Wrongful Act**[.]" D.I. 1-1, Ex. A at 4 (emphasis in original). The Court agrees with SAEDF that a plausible reading of "Loss" could include the USAID claim. If Ironshore must pay "Loss" as a result of a Claim, which includes governmental, regulatory, or administrative proceeding, "then the corresponding definition of 'compensatory damages' must also include the amounts awarded by such government agency." D.I. 12 at 11-12.[5]

For similar reasons, Ironshore's argument that USAID's final administrative order is not a "judgment" improperly narrows the definition of "Loss." As stated above, "Claim" includes

---

[5] USAID is an administrative agency of the United States, and the USAID claim was a result of an administrative audit before USAID. D.I. 1 ¶ 1.

governmental, regulatory, and administrative proceedings. USAID is an administrative agency that issued a final decision ordering SAEDF to pay $2,337,402 for breaching its fiduciary duties and duty of care. D.I. 1 ¶¶ 1, 29. Thus, the Court finds that SAEDF articulates a plausible claim of coverage.[6]

Finally, Ironshore argues that even if the Court were to find that a plausible reading of "Loss" includes the USAID claim, coverage would still be excluded as "contractual liabilities." D.I. 17 at 18. The relevant provision of the Policy states:

> The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** . . . alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the **Not-For-Profit Entity** or any **Insured Person** under any express contract or agreement.

D.I. 1-1, Ex. A at 11. While SAEDF and USAID entered into a grant agreement that controls certain aspects of their relationship, the "Claim" at issue here did not arise out of any "contractual liability" between SAEDF and USAID. *See* D.I. 1 ¶¶ 15-16. In its decision, USAID stated that SAEDF had breached its fiduciary duties and duty of care by not providing discernable oversight over its managers. USAID wrote:

---

[6] Ironshore also argues that SAEDF could not incur an adverse "judgement" "given the expiration of the statute of limitations." D.I. 17 at 2; *see also id.* at 14-18. Ironshore argues:

> [W]hile USAID's final decision on the administrative appeal warned of the potential for collection action, "including the possibility of referral to the Department of Justice for litigation," SAEDF does not allege that USAID or the federal government ever actually initiated any collection action or legal proceedings for repayment. The statute of limitations has now long run on any legal claim USAID might otherwise have had against SAEDF.

*Id.* at 14. The Policy, however, states that Ironshore shall pay all "Loss" which SAEDF is legally obligated to pay as a result of a "Claim" for a "Wrongful Act." D.I. 1-1, Ex. A at 4. As discussed above, SAEDF has alleged sufficient facts sufficient to support its claim that the USAID claim is covered by the Policy under the definition of "Loss." Further, as noted by SAEDF, "nothing in the Policy" "conditions Ironshore's obligations on a collection action by USAID." D.I. 12 at 13.

7

> SAEDF violated both its general fiduciary requirements and its internal controls policies by not providing discernable oversight of ICP. As a result, SAEDF paid ICP $2,500,000 without ICP completing any substantive work towards privatization … There is no indication that SAEDF provided even a basic level of oversight of the funds … SAEDF's actions violated its internal control requirements for making payments and its general fiduciary responsibilities, which required SAEDF to exercise effective control and accountability of all funds.

D.I. 1 ¶ 29 (quoting D.I. 1-1, Ex. B at 6). Thus, USAID did not find that SAEDF breached the grant agreement between USAID and SAEDF. For these reasons, SAEDF has stated a claim, at least at this early stage, that the USAID claim falls within the plain language of the Policy.

## IV. CONCLUSION

For the reasons set forth above, the Court denies Ironshore's Motion.

Therefore, at Wilmington this 10th day of February, 2023, **IT IS HEREBY ORDERED** that Ironshore's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (D.I. 8) is **DENIED. IT IS ALSO HEREBY ORDERED** that, not later than thirty (30) days from the date of this Memorandum Order, the parties shall meet and confer and file a joint proposed Scheduling Order in this action consistent with the applicable form Scheduling Order of Judge Williams, which is posted at http://www/ded/uscourts.gov (*See* Chambers, Judge Williams, Forms), along with a cover letter requesting the Court to enter the joint proposed Scheduling Order (if there are no disputes or other issues concerning scheduling that the Court needs to address) or to schedule the Scheduling Conference. If there are disputes or other issues the Court needs to address in the joint proposed Scheduling Order, in the cover letter, the parties shall direct the Court to the paragraph numbers in the joint proposed Scheduling Order which those appear.

GREGORY B. WILLIAMS<br>
UNITED STATES DISTRICT JUDGE