## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Southern Africa Enterprise Development Fund, | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | C.A. No. 21-cv-1463-GBW |
| Ironshore Specialty Insurance Company, | ) ) ) | |
| Defendant. | ) ) | |

## RESPONSE TO IRONSHORE'S OPENING BRIEF IN SUPPORT OF SUMMARY JUDGMENT

Jody C. Barillare
MORGAN, LEWIS & BOCKIUS LLP
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
(302) 574-3000
jody.barillare@morganlewis.com

Ariane Baczynski
MORGAN, LEWIS & BOCKIUS LLP
1 Federal Street
Boston, MA 02110
(617) 341-7700
ariane.baczynski@morganlewis.com

*Attorneys for Plaintiff Southern Africa Enterprise Development Fund*

May 3, 2024

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..........................................................................................1

II. STATEMENT OF THE NATURE AND STAGE OF
PROCEEDINGS.........................................................................................2

III. SUMMARY OF ARGUMENT....................................................................2

IV. COUNTER-STATEMENT OF RELEVANT FACTS ................................4

V. ARGUMENT................................................................................................5

    A. Ironshore Has Failed To Establish As A Matter Of Law That
There Is No Coverage For The USAID Claim And Its Motion
For Summary Judgment On Counts 1 And 2 Must Be Denied...........5

        1. SAEDF is Legally Obligated to Pay "Loss".............................5

        2. SAEDF's Liability Does Not "Arise Out of" a
Contractual Liability and Therefore Is Not Excluded ..............8

            a) Ironshore Misinterprets and Misapplies the
Contractual Liability Exclusion.......................................8

                (i) Ironshore Misinterprets the "Contractual
Liability" Exclusion .............................................9

                (ii) Ironshore Misapplies the "Contractual
Liability" Exclusion ...........................................12

    B. Ironshore Cannot Establish as a Matter of Law that It Did Not
Breach its Duty of Good Faith and Fair Dealing ..............................17

VI. CONCLUSION...........................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACE Am. Ins. Co. v. Guaranteed Rate, Inc.*,
  305 A.3d 339 (Del. 2023) ...........................................................................10, 11

*Alexion Pharm., Inc. v. Endurance Assur. Corp.*,
  2024 WL 639388 (Del. Sup. Ct. 2024)...............................................................11

*Askew v. Secretary of Health & Human Services*,
  2012 WL 2061804 (Fed. Cl. May 17, 2012) ......................................................15

*Conduent State Healthcare LLC v. AIG Specialty Ins. Co.*,
  2024 WL 55372 (Del. Sup. Ct. 2024).................................................................10

*Dunlap v. State Farm Fire & Cas. Ins. Co.*,
  878 A.2d 434 (Del. 2005) ..................................................................................18

*Eon Labs Mfg., Inc. v. Reliance Ins. Co.*,
  756 A.2d 889 (Del. 2000) ..................................................................................12

*In re Estate of Corriea*,
  719 A.2d 1234 (D.C. App. Ct. 1998)....................................................................6

*Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh
  Pennsylvania*,
  623 A.2d 1118 (Del. Super. Ct. 1992)................................................................18

*Houbigant, Inc. v. Federal Ins. Co.*,
  374 F.3d 192 (3d Cir. 2004) ..............................................................................17

*Intel Corp. v. Am. Guar. & Liab. Ins. Co.*,
  51 A.3d 442 (Del. 2012) ......................................................................................6

*London v. Del. Dep't of Corr.*,
  2021 WL 3422360 (D. Del. Aug. 5, 2021)..........................................................15

*Maccari v. Bituminous Cas. Corp.*,
  2010 WL 4959946 ..............................................................................................19

*Oyola v. 21st Cent. Centennial Ins. Co.*,
  2020 WL 4344553 (Del. Sup. Ct. 2020)................................................................8

*Price v. State Farm Mut. Auto. Ins. Co.*,
  No. Civ.a. N11c-07069rrc, 2013 WL 1213292 (Del. Sup. Ct. Mar.
  15, 2013), *aff'd* 77 A.3d 272 (Del. 2013).....................................................19, 20

*Siga Tech., Inc. v. PharmAthene, Inc.*,
  132 A.2d 1108 (Del. 2015).....................................................................................6

*Tackett v. State Farm Fire & Cas. Ins. Co.*,
  653 A2d 254 (Del. 1995).......................................................................................18

*Taylor v. Hatzel and Buehler*,
  258 A.2d 905 (Del. 1969)......................................................................................13

*U.S. Gypsum Co. v. Admiral Ins. Co.*,
  643 N.E.2d 1226 (Ill. App. Ct. 1994)...................................................................13

*US v. Westinghouse Elec. Corp.*,
  788 F.2d 164 (3rd Cir. 1986)................................................................................15

*Williams Union Boiler v. Travelers Indem. Co.*,
  No. CIV.A.01C-11-001HLA, 2003 WL 22853534 (Del. Super. Ct.
  July 31, 2003)........................................................................................................18

**Other Authorities**

2 C.F.R. 200 ..............................................................................................................16

2 C.F.R. 200.1 ...........................................................................................................16

2 C.F.R. 200.339 ................................................................................................6, 8, 16

2 C.F.R. 200.503 .......................................................................................................15

2 C.F.R. 230 ..............................................................................................................16

2 C.F.R. 700.2 ...........................................................................................................16

2 C.F.R. § 200.1 ........................................................................................................15

22 C.F.R. 226 ............................................................................................................16

-iii-

2 CFR 700.15 ..........................................................................................................16

## I.      INTRODUCTION

Ironshore seeks to avoid its insuring obligations by reimagining USAID's insufficient oversight and breach of fiduciary duty findings into findings of contractual breach and by recasting the damages SAEDF is legally obligated to pay into contractual disallowances. There can be no dispute, however, that USAID found in its final decision that SAEDF failed to exercise sufficient oversight of funds in breach of its fiduciary duties – "wrongful acts" under the Ironshore policy – and as a result SAEDF was legally obligated to pay $2,337,402, a Loss that exceeds the Policy's retention and limits by more than $650,000.  The pertinent documents – the policy and USAID's final decision – establish this as a matter of law.  Thus, Ironshore has failed to establish that there is no coverage for the USAID Claim as a matter of law and its motion for summary judgment on Counts 1 and 2 must be denied.

Likewise, because Ironshore never had a reasonable basis for denying coverage and delayed and avoided SAEDF's attempts to resolve this and the underlying matter, Ironshore has failed to establish that there are no genuine issues of material fact regarding its breach of its duty of good faith and fair dealing and its motion for summary judgment on Count 3 should be denied.

## II.    STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

USAID awarded a grant to SAEDF to promote private enterprise in southern Africa through an investment portfolio.  Ironshore issued a "Not-For-Profit Entity and Directors, Officers Liability Insurance Policy" for the policy period September 13, 2013 to September 13, 2014 promising to "pay on behalf of [SAEDF] all Loss which [SAEDF] shall be legally obligated to pay as a result of a Claim … for a Wrongful Act." ("Policy"). Despite this promise, Ironshore wrongfully denied coverage for USAID's final administrative decision finding SAEDF legally obligated to pay $2,337,402 for failing to exercise sufficient oversight over expenditures in breach of its fiduciary duties ("USAID Claim").  SAEDF filed this action with three causes of action: (1) declaratory relief (2) breach of contract and (3) breach of the duty of good faith and fair dealing.  Fact discovery is closed and the parties moved for summary judgment.  SAEDF submits the following Response to Ironshore's Opening Brief in Support of its Motion for Summary Judgment (D.I. 52).

## III.    SUMMARY OF ARGUMENT

1.    Ironshore has failed to establish as a matter of law that there is no coverage for the USAID claim and its motion for summary judgment on Counts 1 and 2 must be denied.  A plain reading of the Policy and USAID's final decision establishes that the USAID Claim arises out of SAEDF's failure to exercise

sufficient oversight of its expenditures in violation of its fiduciary duties. As a result, SAEDF is legally obligated to pay $2,337,402.00. This sum is Loss because whether it is "compensatory damages" and/or a "judgment" – both of which are undefined in the Policy – Delaware law requires a plain, broad, common-sense reading of the Policy that covers the legal liability resulting from the matters included in the definition of Claim. Neither the record, the case law, nor the Policy retention leads to a different result.

2.    Ironshore reimagines USAID's final decision on appeal against SAEDF as finding a breach of contract.  However, a plain reading of the pertinent documents – the Policy and USAID's final decision – establishes as a matter of law that USAID found SAEDF liable because it failed to exercise sufficient oversight of funds in breach of its fiduciary duties – there were no findings that SAEDF breached the Grant agreement – and therefore the claim does not "arise out of" any "contractual liability" that excludes it from coverage.

3.    Ironshore has failed to establish as a matter of law that it did not breach the duty of good faith and fair dealing and its motion for summary judgment on Count 3 must be denied.  Ironshore breached the duty of good faith and fair dealing because it had no "reasonable justification" for denying SAEDF's insurance claim given the lack of support for Ironshore's unreasonable policy interpretations. Ironshore also violated its duty of good faith and fair dealing by engaging in

egregious conduct in its handling and delays in this matter. Ironshore has failed to establish that it is entitled to summary judgment as a matter of law or that there are on no genuine issues of material fact.

## IV.    COUNTER-STATEMENT OF RELEVANT FACTS

The legal questions of policy interpretation presented here are whether SAEDF's liability arises out of "contractual liability" and the resulting obligation to pay is "Loss."  To answer these legal questions, the Court need only look to USAID's final decision and the Policy.  Yet, Ironshore's purported "Statement of Undisputed Material Facts" consists largely of selective excerpts and strained interpretations of ancillary documents characterized as "facts." (*See e.g.* ¶¶5,7, 12; and ¶8 which is not cited in Ironshore's Brief).  These "facts" are immaterial to the legal questions and only muddy the water in service of Ironshore's attempt to recast the clear findings of USAID's final decision.

SAEDF refers the Court to its separate "Concise Statement of Facts in Support of Plaintiff's Motion for Partial Summary Judgment" (D.I. 55), its separate "Response to Ironshore's Concise Statement of Facts" ("SOF-Response") and its "Concise Statement of Material Facts in Dispute" ("SOMF") filed herewith pursuant to paragraph 9(b) of this Court's Scheduling Order.

## V.     ARGUMENT

### A. <u>Ironshore Has Failed To Establish As A Matter Of Law That There Is No Coverage For The USAID Claim And Its Motion For Summary Judgment On Counts 1 And 2 Must Be Denied.</u>

#### 1.  <u>SAEDF is Legally Obligated to Pay "Loss"</u>

The pertinent documents – the policy and USAID's final decision – establish

beyond dispute and as a matter of law that USAID found that SAEDF failed to

exercise sufficient oversight of funds in breach of its fiduciary duties – "wrongful

acts" under the Policy.  As a result, SAEDF was legally obligated to pay

$2,337,402, a Loss that exceeds the Policy's retention and limits.  Ironshore's

attempts to avoid this result do not establish otherwise and fail as a matter of law.

First, as detailed in SAEDF's Brief,[1] the sum SAEDF is legally obligated to

pay is Loss because whether "compensatory damages" or a "judgment" – both

undefined in the Policy – Delaware law requires a plain, broad, common-sense

reading of the Policy that covers the liability resulting from the matters included in

the definition of Claim. (D.I. 56 at pp. 8-11).[2]  Plus, when asserted by a government

---

[1] To avoid repetition, SAEDF incorporates herein its arguments in its "Opening Brief in Support of Plaintiff's Motion for Partial Summary Judgment" ("SAEDF's Brief" at D.I. 56).

[2] Because policy interpretation is a question of law, Ironshore's reliance on SAEDF's "characterization" of its Loss (or any other document) is irrelevant. *Syngenta*, 2024 WL 763418 at *13 (rejecting discovery into party's subjective belief into undefined policy term).  It is equally irrelevant to policy interpretation that the Federal Rules of Civil Procedure or Appellate Procedure use a narrow definition of "judgment" in the context of its rules for judicial proceedings. (D.I. 52 at 17). *See Intel Corp. v.*

agency, "damages" include regulatory harm.  *Id.*

Second, as stated in SAEDF's Brief (D.I. 56 at p. 11), Ironshore's continued reliance on the word "disallowance" as indicating something other than "damages" is a tactic to suggest – without overtly arguing against established Delaware law – that the Loss here is uninsurable restitution. (D.I. 52 at p. 15-16).  But even if SAEDF's loss is deemed restitution, such damages are still a measure of compensatory damages.  *In re Estate of Corriea*, 719 A.2d 1234, 1241 (D.C. App. Ct. 1998) (finding insured lawyer asserted covered "damages" where client awarded disgorgement as restitution and "just compensation for the wrong" suffered for lawyer's breach of fiduciary duty).[3]  Plus, Ironshore's assertion that SAEDF's loss is not damages is further undermined by the fact that "disallowance" is a remedy available to USAID provided by regulation.[4] 2 C.F.R. 200.339.

Third, Ironshore's reliance on *Zurich Am. Ins. Co. v. Syngenta Corp.*

---

*Am. Guar. & Liab. Ins. Co.*, 51 A.3d 442 (Del. 2012) ("'judgment' generally refers to a decision by some adjudicative body as to the parties' rights.").

[3] Thus, Ironshore's references to the use of "repay" or "refund" (*see* Ironshore SOF ¶¶5, 7, 15) in documents or testimony are irrelevant.

[4] To the extent Ironshore argues that the basis of USAID's decision was that SAEDF's expenditures were "contrary to the restrictions in the Grant Agreement" (which assertion is disputed in SOF-Response ¶¶2, 12 and *infra* at p. 12) it concedes implicitly that the resulting damages are contract damages, which are compensatory damages. *Siga Tech., Inc. v. PharmAthene, Inc.*, 132 A.2d 1108, 1130 (Del. 2015) ("Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promise lost.").

*Protection LLC* does not lead to a different result.  In that case, the court was

deciding whether a letter received by the insured was a "claim for damages."

Focusing primarily on what constitutes a "claim", the court stated:

> If the letter demands—or even requests —anything, it is an
> opportunity to discuss a process by which claims not yet made might
> be adjudicated or otherwise resolved in the future. And even if it
> were a "claim," it does not request or demand "damages," a word
> that means "[m]oney claimed by, or ordered to be paid by one
> person to another as compensation for a loss or injury.

2024 WL 763418 at *9 (Del. 2024).  However, the court was not addressing the

question at issue here, and the holding does not rely on or invoke "compensation

for a loss or injury" (on which Ironshore relies) as essential to the definition:

> As more fully developed below, however, we can discern the
> ordinary meaning of "claim for damages": in the absence of a
> contractual definition, a "claim for damages," is a demand or request
> <u>for monetary relief by</u> or on behalf of an identifiable claimant.

*Id*. at *8.  The court's use of "monetary relief" is not surprising given the case law

cited in SAEDF's Brief supporting a broad interpretation and application of the

term "damages" in the context of insurance. (D.I. 56 at p. 10-11).

Finally, as stated in SAEDF's Brief, Ironshore's invocation of the retention

here is equally unfounded – SAEDF is not "obligated to pay before coverage

attaches".  Rather, the Policy promises that Ironshore will pay Loss that is "in

excess of the applicable Retention" and that Ironshore will make such payment "on

behalf of SAEDF" (D.I. 56 at p. 12-13).  SAEDF's legal obligation to pay

$2,337,402 to USAID far exceeds both the $150,000 Retention and the Policy's $1,500,000 limit of liability, regardless of SAEDF's defense costs, *id.*, which were higher than Ironshore asserts. (SOF-Response ¶¶19).[5]

## 2. SAEDF's Liability Does Not "Arise Out of" a Contractual Liability and Therefore Is Not Excluded

Ironshore seeks to avoid its insuring obligations to SAEDF by reimagining USAID's insufficient oversight and breach of fiduciary duty findings against SAEDF into findings of contractual breach.  However, this effort is betrayed by a plain reading of the pertinent documents: the Policy and USAID's final decision. Together these documents establish as a matter of law that USAID found SAEDF liable because it failed to exercise sufficient oversight of funds in breach of its fiduciary duties – there were no findings that SAEDF breached the Grant agreement – and therefore the claim does not "arise out of" any "contractual liability" that excludes it from coverage.

### a) Ironshore Misinterprets and Misapplies the Contractual Liability Exclusion

The legal question that Ironshore's motion presents to this Court is whether SAEDF's liability as established by USAID's final decision "arises out of"

---

[5] Ironshore's reliance on *Oyola v. 21st Cent. Centennial Ins. Co.*, 2020 WL 4344553 (Del. Sup. Ct. 2020) to suggest that payment of the retention is a "condition precedent" overlooks the Policy, which does not so state. (SAEDF Ex. B, Section V).

SAEDF's "contractual liability."  But Ironshore's Brief all but ignores USAID's final decision (D.I. 52 at 3-7, 10-14), let alone the stated basis for its decision: "SAEDF violated both its general fiduciary requirements and its internal controls policies by not providing discernable oversight of ICP… SAEDF's actions violated its internal control requirements for making payments and its general fiduciary responsibilities, which required SAEDF to exercise effective control and accountability of all funds." (Ex. A at p. 5-6).  Instead, Ironshore focuses on the underlying financial audit, the OIG decision, USAID's initial decision[6], SAEDF's appeal of that decision, various other documents and even SAEDF's testimony in this suit (D.I. 52 at p. 11) for any mention or reference to the Grant, as if the applicable standard is whether there is a link to a contract or whether USAID could have found a breach of contract.  Ironshore thus misinterprets and misapplies the exclusion.

### (i) Ironshore Misinterprets the "Contractual Liability" Exclusion

First, Ironshore's overbroad interpretation of the "arising out of" language is unfounded.  The "meaningful linkage" standard is not a limitless "but for" standard as Ironshore portrays.  Rather, the Delaware Supreme Court has more recently provided guidance as to the contours of the "arising out of" language and clarified

---

[6] Note that USAID's initial decision – like a trial court – was superseded by USAID's final decision on appeal.

that the link between the relevant concepts must be more than a "tangential" or "but

for" relationship that would render the exclusion overbroad:

> "[Insurer's] interpretation of 'arising out of' effectively extends
> coverage of the exclusion to just about anything remotely connected to
> the professional service. Courts have often held that professional
> service exclusions do not apply when the act complained of is only
> incidental to an insured's professional services... In other words, a
> linkage must be meaningful, not tangential."

*ACE Am. Ins. Co. v. Guaranteed Rate, Inc.*, 305 A.3d 339, 348-49 (Del. 2023).

Rather, especially in the context of policy exclusions that must be read narrowly,

"the Court must look to the substance, or gravamen of the underlying lawsuit."

*Conduent State Healthcare LLC v. AIG Specialty Ins. Co.*, 2024 WL 55372 (Del.

Sup. Ct. 2024) ("It would be unreasonable for a fraud exclusion to eliminate

coverage for a loss related to contract claims.").  Thus, the Delaware Supreme

Court has found that the government's claims, while related to the insured's

underlying business, do not in fact "arise out of" the insured's professional service

because the gravamen of the insured's claim is the liability to the government for

wrongful conduct *vis a vis* the government, *i.e.* submitting false certifications under

the False Claims Act.  Though false certifications might not have occurred but-for

the Insured's professional services is irrelevant.  *Guaranteed Rate*, 305 A.3d at 347;

*Alexion Pharm., Inc. v. Endurance Assur. Corp.*, 2024 WL 639388 (Del. Sup. Ct.

2024).

Second, Ironshore's argument is not anchored to the Policy language at issue

– "contractual liability":

> alleging, arising out of, based upon or attributable to any <u>actual or alleged contractual liability of the Not-For-Profit Entity</u>, or any Insured Person under any express contract or agreement."

Instead, Ironshore tries to show a "but-for" connection to the Grant and/or obligations therein.

- "It is thus beyond dispute that, at the very least, USAID's disallowance and resulting 'claim' against SAEDF has at least '<u>some meaningful linkage' to SAEDF's Agreement</u> with USAID, and thus 'arises out of' SAEDF's contractual liability." (D.I. 52 at p. 13).
- "Indeed, even SAEDF acknowledges that the claim arises at least in part <u>out of the Agreement</u>." (D.I. 52 at p. 13).
- "Regardless whether USAID had additional authority for disallowing expenditures beyond the terms of the Agreement, the claim '<u>arises out of' SAEDF's contractual obligations</u>, and is excluded from coverage." (*Id.* at p. 14).

But, a contractual obligation is not the same as contractual liability – "The term "contractual obligation" refers to the duty to pay or perform some certain acts created by a contract or an agreement."[7] "Contractual liability" however is the liability resulting from the breach of such obligation.

Ironshore's reliance on *Eon Labs* proves the point. The court decided that the "products-hazard" exclusion barred coverage because the alleged injury was based on the insured's product notwithstanding allegations that the product was combined with other products. The court decided that because the insured's liability was

---

[7]  *Obligations*, Cornell Law School (last visited May 2, 2024), https://www.law.cornell.edu/wex/obligation.

based on product-liability theories from use of the insured's product, the exclusion must apply. *Eon Labs Mfg., Inc. v. Reliance Ins. Co.*, 756 A.2d 889, 893-4 (Del. 2000).  However, under Ironshore's interpretation, the exclusion would also apply to a "slip and fall" injury in the insured's store-front because "but-for" the manufacturing or sale of that product there would not have been an injury.  But, as the court made clear, it is the <u>product liability exposure</u> that was the gravamen of both the exclusion and the lawsuit.

Here, the exclusion – which must be construed narrowly – targets claims "arising out of… contractual liability."  Accordingly, Ironshore's reliance on tangential or "but-for" links to the Grant in other documents or testimony are insufficient to create a "meaningful linkage" where the gravamen of USAID's final decision is that SAEDF failed to exercise sufficient oversight of funds in violation of its fiduciary duties and does not include any determination that SAEDF breached the Grant.

### (ii) <u>Ironshore Misapplies the "Contractual Liability" Exclusion</u>

As detailed in SAEDF's Brief, the measure of Ironshore's duty to indemnify is the decision establishing SAEDF's legal liability – USAID's final decision.  (D.I. 56 at p. 16).  A plain reading of that decision makes clear that USAID did not find that SAEDF breached the Grant. Ironshore's attempts to rewrite these findings or

impose its own theory of liability cannot lead to a different result.[8]

The final decision makes clear that on appeal USAID:

- modified the reasoning in the initial decision: treating two findings as one and accepting SAEDF's "unreasonableness" argument based on OMB Circular A-122. Instead, the final decision found SAEDF's internal accounting policies required following the reasonableness guidelines as stated in OMB Circular A-122. (*See* SAEDF Ex. A at pp. 3-6)

- acknowledged that "Program Income" (*i.e.* the funds in question here) was not governed by the Grant or OMB regulations, only SAEDF's internal policies and procedures:

   "The cost principles set forth in OMB Circular A-122 shall not apply to Program Income… Furthermore, the use of Program Income is subject to the Fund's corporate and accounting policies and procedures… Since Program Income does not need to comply with OMB Circular A-122, the Fund may modify its corporate and accounting policies and procedures with respect to Program Income, but any such modifications are subject to approval of the SAEDF Board if such modifications would authorize the use of Program Income for costs which are unallowable under OMB Circular A-122." Thus, SAEDF's use of program income was not completely without restriction, as it still had to comply with SAEDF's corporate and accounting policies. SAEDF's Accounting Policies and Procedures Manual, effective at the time the costs were incurred to pay the management fee, still required SAEDF to exercise a certain level of fiduciary oversight over the funds and maintain certain internal controls." (SAEDF Ex. A at p. 4).

- Relied on SAEDF's internal policies for its decision that SAEDF violated its fiduciary duties by not exercising sufficient oversight of funds: "SAEDF violated both its general fiduciary requirements and internal controls policies by not providing discernible oversight of ICP… SAEDF's actions violated its internal control requirements for making payments and its general fiduciary responsibilities, which required SAEDF to exercise effective control and accountability of all funds." (SAEDF Ex. A at p. 5-6).

---

[8] Ironshore may not collaterally attack the final administrative decision. *Taylor v. Hatzel and Buehler*, 258 A.2d 905, 907 (Del. 1969).

Ironshore's efforts to reimagine these findings with any tangential link to the Grant and thus impose its own theory of liability are futile. (D.I. 52 at p. 11-13). Not only are such tangential links irrelevant, *see supra*, but they are belied by the fact that USAID does not rely on such provisions to establish SAEDF's liability. For example, Ironshore points to General Provisions ₱1 as establishing what is "allowable", (D.I. 52 at p. 3-4, 12), but USAID's decision does not rely on this provision. Rather, USAID only refers to General Provisions ₱3 regarding Program Income and decides that the use of Program Income is not governed by the Grant, but instead by SAEDF's corporate and accounting policies. If USAID had determined that SAEDF breached the Grant there would be no reason for USAID to obfuscate or otherwise avoid stating that conclusion.

Ironshore's efforts to conflate a so-called "disallowance" with a breach of the Grant agreement also does not lead to a different conclusion. As stated in SAEDF's Brief, USAID's and OIG's authority and SAEDF's obligations as grantee are anchored in the applicable statutes and regulations. USAID did not need to rely on or otherwise assert a breach of the Grant agreement to establish SAEDF's liability:

- The Inspector General Act of 1978 authorizes the OIG to provide independent oversight to prevent, detect and deter fraud, waste and abuse by

14

conducting audits and investigations.  ADS Ch. 101.3.1.11;[9] ADS Ch. 591;[10] *US v. Westinghouse Elec. Corp.*, 788 F.2d 164 (3rd Cir. 1986).

- Here, the OIG identified "questioned costs" (Ex. 7 at p. 2), which regulations define as "a cost that is questioned by the auditor because of an audit finding: (1) Which resulted from <u>a violation or possible violation of a statute, regulation,</u> or the terms and conditions of a Federal award, including for funds used to match Federal funds; (2) Where the <u>costs, at the time of the audit, are not supported by adequate documentation;</u> or (3) Where the <u>costs incurred appear unreasonable and do not reflect the actions a prudent person</u> would take in the circumstances. 2 C.F.R. § 200.1; ADS Ch. 591

Also, regardless of the Grant, USAID has authority to conduct audits. 2 C.F.R.

200.503.  And what is "allowable" is defined in the applicable regulations:

"Disallowed costs means those charges to a Federal award that the Federal

awarding agency or pass-through entity determines to be <u>unallowable, in</u>

<u>accordance with the applicable Federal statutes, regulations, or the terms and</u>

<u>conditions</u> of the Federal award." See 2 C.F.R. 200.1.  The regulations also

establish that USAID's remedy for grantee noncompliance includes "disallowance."

2 C.F.R. 200.339.[11]  Finally, USAID's regulations also detail its dispute resolution

---

[9] *Available at* https://www.usaid.gov/about-us/agency-policy/series-100/101.  The Court may take judicial notice of information posted on government websites as it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  *See e.g., London v. Del. Dep't of Corr.*, 2021 WL 3422360, at *7 n.15 (D. Del. Aug. 5, 2021) (taking judicial notice of a job posting on a government website).

[10]  *Available at* https://www.usaid.gov/ads/policy/500/591

[11]  Thus, contrary to Ironshore's assertion (D.I. 52 at p. 12), SAEDF disputes that what is "allowable" is only a contractual restriction that arises from the Grant agreement, and as stated above, USAID's final decision does not point to the Grant for that standard.

procedures. 2 CFR 700.15; ADS Ch. 303.3.23.[12]

Thus, USAID's decision regarding the allowability of questioned costs need not – and did not – rely on or otherwise assert a breach of the Grant agreement to establish SAEDF's liability.  In sum, Ironshore's focus and reliance on the use of the term "disallowance" or other tangential links to the Grant have no bearing and certainly are not dispositive of the relevant inquiry here, namely whether USAID's final decision establishes that SAEDF's liability "arises out of contractual liability."[13]

Finally, the fact that Ironshore does not point to any legal support for its application of the exclusion here reinforces that it is up-ending the applicable standards.  As stated in SAEDF's Opening Brief, there are numerous decisions that make clear that the "contractual liability" exclusion – or any exclusion – is not intended to be applied so broadly that it swallows the coverage otherwise granted. The interpretation that Ironshore proposes here leads to just that result because conceivably all of SAEDF's conduct could have a "but-for" link to the Grant since it is the document by which SAEDF was awarded the money to embark on its mission.  Relevant caselaw makes clear that the mere existence of an agreement is

---

[12] *Available at https://www.usaid.gov/about-us/agency-policy/series-300/303*

[13] It is also irrelevant that SAEDF asserted to USAID that its final decision could be challenged as a breach of the Grant. (D.I. 52 at p. 13). SAEDF's recourse for USAID final agency action has no bearing on USAID's reasoning as to SAEDF's liability.

insufficient to trigger the contractual liability exclusion. (D.I. 56 at p. 18-19); *see e.g. Houbigant, Inc. v. Federal Ins. Co.*, 374 F.3d 192, 202 (3d Cir. 2004) (finding contract exclusion does not apply because "Although the relationship between [claimant] and insureds is contractual, the actions of the Insureds were independently tortious.")

In sum, Ironshore's motion for summary judgment on Counts 1 and 2 must be denied as advancing an overbroad and unreasonable interpretation of the Policy that it then misapplies to the claim at issue here. As stated in SAEDF's Opening Brief, Ironshore has the burden of establishing the applicability of the exclusion here and it must do so based on a "strict and narrow" reading of the policy language which it has failed to do here.

## B. Ironshore Cannot Establish as a Matter of Law that It Did Not Breach its Duty of Good Faith and Fair Dealing

Ironshore's argument misinterprets the applicable standards for a bad faith claim against an insurance company.  By relying primarily on decisions not involving insurance, Ironshore does not address the scope of its duty of good faith and fair dealing or its conduct at issue here that violates that duty.  Thus Ironshore fails to establish as a matter of law that it is entitled to summary judgment.

With respect to an insurance policy, the implied duty of good faith and fair dealing is multi-faceted.  One incarnation is that the insurer may not delay or refuse to pay a claim without a "reasonable justification".  *Tackett v. State Farm Fire &*

*Cas. Ins. Co.*, 653 A2d 254, 262-63 (Del. 1995); *Dunlap v. State Farm Fire & Cas. Ins. Co.*, 878 A.2d 434, 442 (Del. 2005). *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh Pennsylvania*, 623 A.2d 1118, 1121 (Del. Super. Ct. 1992); *Williams Union Boiler v. Travelers Indem. Co*., No. CIV.A.01C-11-001HLA, 2003 WL 22853534, at *1 (Del. Super. Ct. July 31, 2003).

But an insurance company's duty of good faith and fair dealing is not limited to its "failure to pay". *Dunlap*, 878 A.2d at 443. Rather, Ironshore has additional obligations with respect to how it investigates, processes and otherwise responds to claims. *Dunlap*, 878 A.2d at 443-44. Delaware law recognizes that "in an insurance context, good faith requires:

> that the insurer act in a way that honors the insured's reasonable expectations. This includes a duty, on the insurer's part, 'not to take advantage of the [parties'] unequal positions in order to become a secondary source of injury to the insured. The implied covenant of good faith requires more than just literal compliance with the policy provisions and statutes. It requires the insurer to act in a way that honors the insureds reasonable expectations.

*Price v. State Farm Mut. Auto. Ins. Co*., No. Civ.a. N11c-07069rrc, 2013 WL 1213292 at *13 (Del. Sup. Ct. Mar. 15, 2013), *aff'd* 77 A.3d 272 (Del. 2013). Moreover, such misconduct is deemed willful or malicious when the insurer acts with 'reckless indifference to the plight of the insured' or "conscious indifference to the rights of others." *Maccari v. Bituminous Cas. Corp.*, 2010 WL 4959946 at *[pin] (D. Del. 2010) *aff'd* 447 Fed.Appx. 340 (3rd Cir. 2011).

18

Based on the coverage arguments, Ironshore violated its duty of good faith and fair dealing here because it cannot be said that Ironshore had a "reasonable justification" for denying SAEDF's insurance claim given the lack of support for Ironshore's unreasonable policy interpretations. What is more, Ironshore has also violated its duty of good faith and fair dealing by engaging in egregious conduct in its handling and delays in this matter. In particular,

- Ironshore was notified in December 2017 of USAID's final decision and SAEDF's legal obligation to pay, but Ironshore did not meaningfully respond for more than 10 months. SAEDF chased Ironshore repeatedly, including inviting Ironshore to participate in efforts to settle with USAID, but it was not until SAEDF accused Ironshore of abdicating its obligations that it denied the claim in a letter dated October 22, 2018. (SOMF at ℙ1).

- In that letter, Ironshore misrepresented certain facts about the claim and the proper application of the policy terms to those facts, which SAEDF identified in a letter dated June 28, 2019 and to which Ironshore never responded. (SOMF at ℙ2).

- Since 2019, Ironshore has put its interests ahead of SAEDF's by delaying resolution of this matter. Ironshore repeatedly evaded, delayed and/or failed to respond to SAEDF's entreaties to resolve this matter including through mediation. SAEDF requested mediation in January 2020 and after numerous requests, Ironshore finally agreed in June 2021 to schedule mediation. (SOMF at ℙ3).

All of these egregious delays exhibit Ironshore's unreasonable handling of this matter with reckless indifference to SAEDF's plight, including SAEDF's ongoing financial condition, liquidation and wind-down. Ironshore did not honor SAEDF's reasonable expectations that its insurer would respond in a timely and reasonable manner. Rather, Ironshore's repeated delay tactics seemingly were in service of its

attempt to use the purported statute of limitations to avoid its insuring obligations. (See D.I. 8 and 22). Ironshore took "advantage of the [parties'] unequal positions in order to become a secondary source of injury" to SAEDF. *Price v. State Farm Mut. Auto. Ins. Co*., 2013 WL 1213292 at *13 (Del. Sup. Ct. Mar. 15, 2013), *aff'd* 77 A.3d 272 (Del. 2013).

In light of the foregoing, Ironshore has failed to establish that it is entitled to summary judgment as a matter of law or that there are on no genuine issues of material fact. Ironshore's motion for summary judgment on Count 3 should therefore be denied.

## VI.   CONCLUSION

SAEDF respectfully requests that this Court deny Ironshore's motion for summary judgment.

Respectfully submitted,

*/s/ Jody C. Barillare*
Jody C. Barillare (#5107)
MORGAN, LEWIS & BOCKIUS LLP
1201 N. Market Street, Suite 2201
Wilmington, Delaware 19801
(302) 574-3000
jody.barillare@morganlewis.com

Ariane Baczynski
MORGAN, LEWIS & BOCKIUS LLP
1 Federal Street
Boston, Massachusetts 02110

(617) 341-7700
ariane.baczynski@morganlewis.com

*Attorneys for Plaintiff Southern Africa*
*Enterprise Development Fund*

May 3, 2024