IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SOUTHERN AFRICA ENTERPRISE DEVELOPMENT FUND,<br><br>                Plaintiff,<br><br>                v.<br><br>IRONSHORE SPECIALTY INSURANCE COMPANY,<br><br>                Defendant. | C.A. No. 21-1463-GBW |

## MEMORANDUM ORDER

Pending before the Court is Plaintiff Southern Africa Enterprise Development Fund ("SAEDF" or "Plaintiff") and Defendant Ironshore Specialty Insurance Company's ("Ironshore" or "Defendant") cross-motions for partial summary judgment. D.I. 50, D.I. 54. Having reviewed the parties' motions for summary judgment and all related briefing (D.I. 51 – D.I. 53, D.I. 55 – D.I. 66), the Court hereby finds that: (1) Ironshore's motion for summary judgment on SAEDF's claim for breach of contract is **GRANTED**; (2) SAEDF's claim seeking declaratory relief is **DENIED as MOOT**; (3) Ironshore's motion for summary judgment on SAEDF's claim for breach of the covenant of good faith and fair dealing is **GRANTED-IN-PART** and **DENIED-IN-PART**; and (4) SAEDF's motion for summary judgment is **DENIED** as **MOOT** on all grounds.

I.    BACKGROUND

    A.  USAID Grant

In March 1995, the United States Agency for International Development ("USAID") awarded a multi-million-dollar grant to SAEDF, a non-profit organization, to encourage the creation and expansion of indigenous small and medium-sized enterprises in the Southern Africa

region through the development of an investment portfolio. D.I. 53, Ex. 1. As part of this award, SAEDF executed a grant agreement with USAID (hereinafter, the "Grant Agreement"), which remains in force until SAEDF is wound up and liquidated. D.I. 51, ¶ 1; D.I. 53, Ex. 1.

On or around August 5, 1997, SAEDF and USAID executed a modification to the Grant Agreement (hereinafter, "Modification 04") which amended the Grant Agreement to require, among other things: (1) that audits of SAEDF "shall comply with OMB Circular A-133," and (2) that "Program Income" "be used to further program objectives." *See generally* D.I. 53, Ex. 2. With respect to SAEDF's use of Program Income, Modification 04 also stated that:

> The cost principles set forth in OMB Circular A-122 shall not apply to Program Income. However, the SAEDF Board shall review, and if appropriate, formally approve any use of Program Income to cover unallowable costs under OMB Circular A-122 which were incurred by SAEDF under this Grant prior to October 4, 1996. Furthermore, the use of Program Income is subject to the Fund Corporate and Accounting Policies and Procedures. The Fund's corporate and accounting policies and procedures, as conditionally approved by USAID on July 27, 1996, and September 3, 1996, and finally approved by USAID on February 18, 1997, comply with OMB Circular A-122.

*Id.* at 3. Modification 04 made no changes to the Grant Agreement's provision on "Allowable Costs" and no changes to the Grant Agreement's "Refund" requirements.

In October 2013, SAEDF's auditors prepared a report of SAEDF's financial statements for a two-year period ending on September 30, 2012. D.I. 53, Ex. 4. The auditors' Findings and Questioned Costs included $1,037,402 in distributions to three former SAEDF officers who had formed an entity, Inflection Capital Partners, LLC ("ICP"), to which SAEDF was attempting to transition fund management. *Id.* at I-24. After reviewing the audit, the Office of Inspector General ("OIG") recommended that USAID and SAEDF determine: (1) the allowability of $1,109,459 in questioned costs for excess compensation, including the $1,037,402; (2) the reasonableness of $1.3

million in management fees paid to ICP; and (3) the allowability of $360,000 spent by SAEDF on lobbying. D.I. 53, Ex. 7. On May 19, 2014, Patrick Killars, a USAID officer, issued an "Agreement Officer's final decision regarding the questioned costs." D.I. 53, Ex. 11. Killars' decision found that: (1) $1,037,402 in excess compensation to three ICP principals was "unallowable"; (2) that $1.3 million in management fees paid by SAEDF to ICP was "unreasonable and therefore unallowable"; and (3) that the $360,000 expenditure for lobbying was disallowed pursuant to A-122 and federal regulations. *Id.* On June 18, 2014, SAEDF filed an administrative appeal pursuant to the Grant Agreement's procedures and argued that USAID's findings were arbitrary, capricious, and premature. D.I. 53, Ex. 13. USAID issued its final decision on administrative appeal (hereinafter, the "Final Decision") on December 8, 2017. D.I. 53, Ex. 15. The Final Decision upheld the disallowance of $1,037,402 in excess compensation and $1.3 million in management fees but reversed the disallowance of lobbying costs. *Id.* USAID required SAEDF to "return to USAID $2,337,402 in federal funding that remain[ed] disallowed." *Id.* at 7.

### B. Ironshore Policy

In late 2013, Ironshore issued a "Not-For-Profit Entity and Directors, Officers Liability Insurance Policy" (hereinafter, the "Policy") for the policy period September 13, 2013 to September 13, 2014 promising to "pay on behalf of [SAEDF] all Loss which [SAEDF] shall be legally obligated to pay as a result of a Claim … for a Wrongful Act." D.I. 53, Ex. 6. On June 17, 2014, SAEDF informed Ironshore of USAID Agreement Officer Patrick Kollars' final decision and SAEDF's intent to appeal the decision. D.I. 53, Ex. 12. In January 2017, SAEDF asked Ironshore to approve $92,020.50 in legal fees that were incurred by SAEDF in responding to the questioned or disallowed expenditures. D.I. 53, Ex. 19. Shortly thereafter, in December 2017, SAEDF notified Ironshore of USAID's Final Decision and requested coverage for the

3

"unallowable" costs SAEDF was ordered to return to USAID (hereinafter, the "USAID Claim"). D.I. 61, ¶ 1. On October 22, 2018, Ironshore denied coverage of the USAID Claim. D.I. 57, Ex. D. SAEDF responded by filing an insurance recovery action before this Court asserting three causes of action against Ironshore: (1) declaratory relief; (2) breach of contract; and (3) breach of the duty of good faith and fair dealing. D.I. 1.

## II.   LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). "[A] dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* (internal quotation marks omitted).

In determining the appropriateness of summary judgment, a court must review the record as a whole and "draw all reasonable inferences in favor of the nonmoving party, [but] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). If a court determines that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," summary judgment is appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)). The moving party is also entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. ANALYSIS

### A. Ironshore is Entitled to Summary Judgment on SAEDF's Breach of Contract Claim.

In moving for summary judgment on SAEDF's breach of contract claim, Ironshore contends that the USAID Claim is excluded from coverage under the explicit terms of the Policy. D.I. 52 at 10–11. For the following reasons, the Court agrees and finds that Ironshore did not breach the Policy by refusing to cover the USAID Claim.

Under the explicit terms of the Policy executed between SAEDF and Ironshore, the parties agreed to exclude from coverage any Claim:

> alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of [SAEDF] under any express contract or agreement.

D.I. 53, Ex. 6 at 8. According to Ironshore, the USAID Claim "aris[es] out of" the Grant Agreement, which is an express contract between SAEDF and USAID. D.I. 52 at 11. Ironshore contends that the "arising out of" language must be construed under Delaware law to require "some meaningful linkage between" between the USAID Claim for which SAEDF seeks indemnity and SAEDF's contractual liabilities under the Grant Agreement. *Id.* Because the USAID Claim arose from a decision from USAID disallowing two of SAEDF's expenditures to ICP principals and a management fee paid to ICP using funds granted under the Grant Agreement, Ironshore argues that there is a clear and meaningful linkage between the USAID Claim and SAEDF's contractual liabilities. *Id.* at 12–13. Indeed, Ironshore notes that it is the Grant Agreement's general provisions that gave USAID the authority "(1) to audit SAEDF's financial statements; (2) to allow or disallow expenditures; and (3) to engage in administrative appeals of disputes. *Id.* at 11. Thus, Ironshore maintains that it did not breach the Policy by refusing to cover the USAID Claim. *Id.* at 13.

5

SAEDF disputes Ironshore's description of USAID's findings against SAEDF and contends that a closer look at the Policy and USAID's Final Decision shows "that USAID found SAEDF liable because it failed to exercise sufficient oversight of funds in breach of its fiduciary duties – there were no findings that SAEDF breached the Grant agreement . . . ." D.I. 60 at 1. Thus, according to SAEDF, the USAID Claim did not "arise out of" a "contractual liability." *Id.* SAEDF argues that Ironshore, by seeking to "reimagine the[] [USAID's] findings" to create a "tangential link" to the Grant Agreement, advances "an overbroad and unreasonable interpretation" of the Grant Agreement and its exclusion provision. *Id.* at 9–13.

Both parties recognize that a dispute exists as to the scope of the Grant Agreement's exclusion provision and, more specifically, the meaning of two of the provision's terms: "arising out of" and "contractual liability." *Id.*; D.I. 52 at 10. Because insurance policies are contracts and "[t]he proper construction of any contract is purely a question of law," these disputes can be resolved by the Court on summary judgment. *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1263 (Del. 2017); *see also Eon Labs Mfg., Inc. v. Reliance Ins. Co.*, 756 A.2d 889, 892 (Del. 2000). In construing each term, "[t]he objective is to give effect to the parties' mutual intent at the time of contracting." *Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. CVN17C10083PRWCCLD, 2018 WL 6266195, at *4 (Del. Super. Ct. Nov. 30, 2018). Delaware law applies an objective theory of contract, which seeks to construe terms to "adhere to what 'would be understood by an objective, reasonable third party.'" *Id.* (citing *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014)). "Clear and unambiguous language in an insurance contract should be given 'its ordinary and usual meaning.'" *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001) (internal citations omitted).

Here, neither disputed term is ambiguous. Rather, "arising out of" and "contractual liability" can each be construed consistent with their plain and ordinary meaning. As to the term "contractual liability," SAEDF insists that a "contractual liability" must be distinguished from a "contractual obligation" which, according to SAEDF, "refers to the duty to pay or perform some certain acts created by a contract or an agreement." D.I. 60 at 11. SAEDF contends that a "contractual liability," on the other hand, "is the liability resulting from the breach of such [contractual] obligations." *Id.* However, Black's law dictionary defines the term "obligation" as "a legal duty, by which a person is bound to do or not to do a certain thing." *Obligation*, Black's Law Dictionary (2nd ed.). The term "liability," on the other hand, refers to "[t]he state of being bound or obliged in law or justice **to do, pay, or make good something**; legal responsibility." *Liability*, Black's Law Dictionary (2nd ed.) (emphasis added). Thus, a "contractual liability," simply refers to a liability expressly assumed under a written contract or agreement. Such a liability can be created when a contracting party has a contractual obligation to do, pay, or make something, either because of a breach of the contract or under the explicit terms of the contract itself. *See Crownover v. Mid-Continent Cas. Co.*, 772 F.3d 197, 202 (5th Cir. 2014) (finding that a "contractual liability" refers to a payment or thing that the contracting party would not owe absent the contract or agreement).

With respect to the term "arising out of," Delaware courts construe this term broadly and, in the insurance policy context, have interpreted it to "require some meaningful linkage between the two conditions imposed in the contract." *Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1256–57 (Del. 2008). Thus, "Delaware law has since adopted the construction that 'arising out of' is broader than 'caused by,' and is understood to mean 'originating from,' 'having its origin in,' 'growing out of,' or 'flowing from.'" *Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No.

7

CVN17C10083PRWCCLD, 2018 WL 6266195, at *4 (Del. Super. Ct. Nov. 30, 2018); *SPay, Inc. v. Stack Media Inc.*, No. CV 2020-0540-JRS, 2021 WL 1109181, at *3 (Del. Ch. Mar. 23, 2021) ("Black's Law Dictionary defines 'arise' to mean, '[t]o originate; to stem (from)'. . . ." (citing *Arise*, Black's Law Dictionary (11th ed. 2019)). "In short, it means 'incident to, or having a connection with.'" *Goggins*, 2018 WL 6266195, at *4. In *Goggins*, the Delaware Superior Court applied the "but-for" test to determine whether the claim "ar[ose] out of" a product liability suit. In finding that the disputed claim did "arise out of" the suit, the court explained that "the question is whether the underlying claim would have failed 'but for' the purportedly excluded conduct." *Id.* (noting that "[a] claim does not 'arise out of' a circumstance or conduct if, independent of that circumstance or conduct, the claim is still valid").

While SAEDF contends that there is no "meaningful linkage" between USAID's final decision and the Grant Agreement because "the gravamen of USAID's final decision is that SAEDF failed to exercise sufficient oversight of funds in violation of its fiduciary duties," SAEDF ignores that the "fiduciary duties" noted by USAID were created by and pursuant to the Grant Agreement. *See* D.I. 60 at 12. Indeed, once executed, Modification 04 required SAEDF to create internal corporate and accounting policies and procedures and obligated SAEDF to comply with those internal procedures when using Program Income, including by exercising fiduciary oversight over expenditure of funds. D.I. 53, Ex. 2 at 3 (requiring that "the use of Program Income is subject to the Fund's corporate and accounting policies and procedures . . . as conditionally approved by USAID on July 27, 1996 and September 3, 1996, and finally approved by USAID on February 18, 1997"). Thus, when the USAID ultimately found that SAEDF failed to exercise such oversight over Program Income paid to ICP, USAID cited to the fiduciary obligations and internal corporate and accounting policies made applicable by, and originating from, Modification 04 and the Grant

8

Agreement. Because these fiduciary obligations originated from the Grant Agreement, the Court agrees with Ironshore that the USAID Claim had at least some meaningful linkage to a written agreement.

While SAEDF contends that USAID acknowledged that "Program Income" was not governed by the Grant Agreement or OMB regulations, nowhere did the Final Decision hold that "Program Income" was not governed by the Grant Agreement. *See* D.I. 60 at 14. Rather, as noted *supra*, USAID's finding that "Program Income" was subject to SAEDF's internal policies and procedures was consistent with Modification 04, which obligated SAEDF to follow its internal procedures. Similarly, in emphasizing that "Program Income" was not governed by OMB regulation, the Final Decision tracked the express language of Modification 04 and, consistent with Modification 04, found that: (1) SAEDF's internal policies required compliance with OMB Circular A-122; (2) Program Income "does not need to comply with CMB Circular A-122;" and (3) SAEDF's corporate and accounting policies and procedures could be modified "subject to the approval of the SAEDF Board if such modifications would authorize the use of Program Income for costs which are unallowable under CMB Circular A-122." D.I. 53, Ex. 15 at 3–4; *see also* Ex. 2 at 3 (requiring the same). Thus, the Court agrees with Ironshore that "USAID's references to SAEDF's 'fiduciary oversight' and its 'internal controls policies' went expressly to the heart of the contractual restrictions on SAEDF's expenditures under the modified terms of the agreement." D.I. 64 at 6.

Moreover, the facts surrounding the USAID Claim confirm that the claim has at least some meaningful linkage to the Grant Agreement. For instance, the audit that resulted in the disallowed expenditures under the USAID Claim was triggered pursuant to the Grant Agreement, including Modification 04's requirement that "audits shall comply with OMB Circular A-133." D.I. 53, Ex.

9

2 at 3. Also, in finding that certain expenditures were disallowed, USAID explained that the expenditures were "unreasonable" and/or not "allowable in accordance with the terms" of the Grant Agreement. *See, e.g.*, D.I. 53, Ex. 15 at 4 (citing Modification 04 and noting that "SAEDF's use of program income was not completely without restriction . . ."). Given this evidence, there is an indisputable and meaningful linkage between SAEDF's liability under the Grant Agreement and the USAID Claim. D.I. 64 at 6. Rather than being "tangential" to the Grant Agreement, the USAID Claim stems from the very restrictions and obligations placed on SAEDF and USAID under the agreement. Thus, Ironshore's motion for summary judgment as to SAEDF's breach of contract claim is **GRANTED**.[1]

### B. SAEDF's Claim for Declaratory Judgment is Moot.

In pursuing a claim for declaratory relief, "SAEDF seeks a declaration of its rights and Ironshore's obligations under the Policy" and, more specifically, "that the Policy provides coverage for the USAID Claim . . . ." D.I. 1, ¶ 54. As noted above, however, the Court finds that the Policy excludes the USAID Claim from coverage. As there are no other present disputes between the parties, a declaratory judgment would not "clarify and settle legal relations in issue" nor would it "terminate and afford greater relief from the uncertainty, insecurity, and controversy giving rise to present action." *Delaware State Univ. Student House Found. v. Ambling Mgmt. Co.*, 556 F. Supp. 2d 367, 374 (D. Del. 2008) (internal citations omitted). Accordingly, the Court sees no reason to issue a declaratory judgment and dismisses SAEDF's claim for such relief as **MOOT**. Also, SAEDF's motion for summary judgment as to this claim is **DENIED as MOOT**.

---

[1] Because the Court grants summary judgment in favor of Ironshore, SAEDF's cross-motion for summary judgment for breach of contract is **DENIED**.

## C. Ironshore is Entitled to Partial Summary Judgment on SAEDF's Claim for Breach of the Covenant of Good Faith and Fair Dealing.

Delaware law "recognizes [] the covenant of good faith and fair dealing implied in all contracts" and interprets the covenant as requiring the contracting parties to "act in a way that honors [their] reasonable expectations." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 444 (Del. 2005). Yet, "the implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract." *Alliance Data Sys. Corp. v. Blackstone Capital P'rs V L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009). "The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009). Under Delaware law, "the covenant is a limited and extraordinary legal remedy." *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (internal citations omitted); *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.").

Ironshore contends that the covenant has no application here, given that the "contract addresses the conduct at issue." D.I. 52 at 18 (internal citations omitted). Specifically, Ironshore argues that, because SDAEF's claim is excluded under the Policy, Ironshore did not act improperly or unreasonably by denying SAEDF's claim. The Court agrees. The express terms of the Policy control this claim and, as noted above, the terms of the Policy exclude the USAID Claim from coverage. Because the "implied [covenant of] good faith cannot be used to circumvent the parties'

bargain, or to create a 'free-floating duty . . . unattached to the underlying legal document," SAEDF's claim that Ironshore breached the covenant of good faith by declining to pay the USAID Claim must fail. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005).

SAEDF contends, however, that Ironshore also breached the covenant of good faith "by engaging in egregious conduct in its handling and delays in this matter." D.I. 60 at 19. According to SAEDF, as the insured party, it had a "reasonable expectation[]" that Ironshore "would respond in a timely and reasonable manner" to SAEDF's insurance claim. *Id.* Yet, SAEDF argues that Ironshore failed to respond for more than 10 months and forced SAEDF to "chase[] Ironshore repeatedly" before Ironshore even denied the claim. D.I. 61, ¶ 1 (claiming that Ironshore also "misrepresented certain facts about the claim"); *Id.*, ¶ 3 (alleging that Ironshore "evaded, delayed and/or failed to respond to SAEDF's entreaties to resolve this matter including through mediation"). Whether this conduct amounts to a breach of the covenant of good faith is a question of fact that cannot be resolved at summary judgment.

Ironshore's motion for summary judgment against SAEDF's claim for breach of the covenant is therefore **GRANTED-IN-PART** and **DENIED-IN-PART** as follows: (1) summary judgement is **GRANTED** in Ironshore's favor with respect to SAEDF's claim that Ironshore breached the covenant by denying coverage of the USAID Claim; and (2) summary judgment is **DENIED** with respect to the extent that SAEDF intends to argue that Ironshore breached the covenant of good faith by delaying resolution of SAEDF's insurance claim.

***

At Wilmington this 11th day of September 2024, **IT IS HEREBY ORDERED** that:

1. Ironshore's Motion for Summary Judgment on SAEDF's claim for breach of contract (D.I. 50) is **GRANTED**;

12

2. SAEDF's claim seeking declaratory relief is **DENIED** as **MOOT**;

3. Ironshore's Motion for Summary Judgment on SAEDF's claim for breach of the covenant of good faith and fair dealing (D.I. 50) is **GRANTED-IN-PART** and **DENIED-IN-PART**; and

4. SAEDF's Motion for Summary Judgment (D.I. 54) is **DENIED** as **MOOT** on all grounds.

_____
GREGORY B. WILLIAMS
U.S. DISTRICT JUDGE